UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CV-62104-DIMITROULEAS/STRAUSS

**ADJ 26, LLC,** *et al.*,

      Plaintiffs,

v.

**ISRAEL ISAAC GIGI,** *et al.*,

      Defendants.

_____/

## <u>OMNIBUS REPORT AND RECOMMENDATION</u>

THIS MATTER is before the Court on Plaintiffs' Motion for Preliminary Injunction ("PI Motion") [DE 8] and Defendants', Israel Isaac Gigi and Yakov Zroya, Motion to Dismiss ("Motion to Dismiss") [DE 51]. The PI Motion has been referred to me for the issuance of a report and recommendation with respect to the individual defendants, Israel Isaac Gigi ("Gigi") and Yakov Zroya ("Zroya"), and the Motion to Dismiss has been referred to me for consideration and the issuance of a report and recommendation in conjunction with the PI Motion. *See* [DE 57].

I have carefully reviewed and considered both motions, Gigi's and Zroya's response to the PI Motion [DE 97], the response and reply to the Motion to Dismiss [DE 76, 80], the Joint Preliminary Injunction Hearing Stipulation of Undisputed Facts ("Stipulation") [DE 100], the Court's orders addressing dismissal and injunctive relief with respect to Defendant Real Distribution, LLC ("Real Distribution") [DE 75, 78], Plaintiffs', Gigi's, and Zroya's Closing Arguments and Proposed Findings of Fact and Conclusions of Law [DE 107, 108, 109, 110], the evidence submitted into the record, including affidavits as well as exhibits and witness testimony from the evidentiary hearings held on October 28, 2021, November 1, 2021, and November 29, 2021, and all other pertinent portions of the record. For the reasons discussed herein, I respectfully

**RECOMMEND** that the PI Motion [DE 8] be **DENIED** and that the Motion to Dismiss [DE 51] be **GRANTED IN PART and DENIED IN PART**.

<u>**BACKGROUND**</u>

On October 8, 2021, Plaintiffs, ADJ 26, LLC ("ADJ") and FUME, LLC ("Fume"), commenced this action against Defendants Gigi (a/k/a Ikey), Zroya (a/k/a Kobi), and Real Distribution, alleging as to all Defendants various trademark claims, unfair competition, tortious interference with a business relationship, fraud by nondisclosure, conversion, and civil conspiracy, as well as claims against the individual Defendants, Gigi and Zroya, for breach of fiduciary duties, fraudulent misrepresentation, negligent misrepresentation, breach of contract, and fraud in the inducement. *See* [DE 1]. Fume brought the claims in Counts 1-13; ADJ brought the claims in Counts 14-16 – the claims for breach of contract and fraud in the inducement, as well as one of the two conspiracy claims.

ADJ, Gigi, and Zroya are the three members of Fume, which has been operating under the December 16, 2020 Amended and Restated Operating Agreement ("Operating Agreement") since the execution thereof. ADJ owns a 50% interest in Fume, and Gigi and Zroya each own a 25% interest. Gigi and Zroya also own minority interests in Real Distribution. A third member, who is not a party to this case and who does not own any interest in Fume or ADJ, holds a majority ownership interest in Real Distribution.

Plaintiffs sought and obtained an *ex parte* Temporary Restraining Order ("TRO") against all three Defendants. *See* [DE 1, 8, 12, 13]. Plaintiffs also sought a preliminary injunction as to all three Defendants. *See* [DE 1, 8]. Separately, all three Defendants moved to dismiss this case, arguing that Plaintiffs should be compelled to mediate, and then, if necessary, arbitrate the claims in this case pursuant to the Operating Agreement. *See* [DE 51, 52].

2

The District Court has already addressed Plaintiffs' request for a preliminary injunction against Real Distribution, as well as Real Distribution's request for dismissal. Specifically, on November 8, 2021, the Court granted Real Distribution's motion to dismiss in part, finding that while the Court had jurisdiction to enter the TRO and to consider Plaintiffs' request for a preliminary injunction against Real Distribution, Plaintiffs' claims against Real Distribution should be dismissed in favor mediation and/or arbitration following the disposition of Plaintiffs' request for a preliminary injunction against Real Distribution. *See* [DE 75] ("Real Dismissal Order"). Then, on November 10, 2021, the Court entered an order denying Plaintiffs' request for a preliminary injunction against Real Distribution. *See* [DE 78] ("Real PI Order"). However, Plaintiffs' request for a preliminary injunction against Gigi and Zroya, and Gigi's and Zroya's request for dismissal (for essentially the same reasons Real Distribution sought dismissal), remain pending and are addressed in this Report.[1]

## MOTION TO DISMISS

Pursuant to the Motion to Dismiss, Gigi and Zroya seek dismissal of this case, asserting that Plaintiffs' claims are subject to a mediation/arbitration provision in section 17.13 of the Operating Agreement. They assert that the Court lacks subject matter jurisdiction over this matter as a result of that provision. Plaintiffs acknowledge that their claims in this case are subject to the mediation/arbitration provision. However, they contend that the provision does not prevent them from seeking injunctive relief from this Court, particularly in light of a separate section of the Operating Agreement, section 17.15, which provides, in pertinent part, the following:

> In the event of a breach of this Agreement by an [sic] Member, it is possible that remedies at law may be inadequate and, therefore, the Members shall be entitled to equitable relief including, without limitation, injunctive relief, specific

---

[1] The TRO was previously extended as to Gigi and Zroya (based upon their consent) pending the Court's ruling on Plaintiffs' request for a preliminary injunction against them. *See* [DE 35].

performance or other equitable remedies in addition to all other remedies provided hereunder or available to the parties hereto at law or in equity.

The District Court has already addressed a motion to dismiss that Real Distribution filed on the same grounds. *See* Real Dismissal Order. In doing so, the District Court specifically interpreted the sections of the Operating Agreement at issue (sections 17.13 and 17.15), stating as follows:

> Plaintiff argues, and the Court agrees, that the Operating Agreement expressly contemplates that the Court may determine any request for immediate injunctive relief to preserve the status quo before compelling mediation and/or arbitration.
> . . .
> Defendant's interpretation of the mediation and arbitration provision of the Operating Agreement to prevent the Court from entertaining the issue of temporary and/or preliminary injunctive relief would render the Litigation provision entirely superfluous, an interpretation disfavored by the canons of statutory construction, which requires the Court to reconcile potentially conflicting clauses so as to give a reasonable and effective meaning to all terms. *See, e.g.*, *Jacobs v. Bank of Am. Corp.*, No. 1:15-CV-24585-UU, 2019 WL 2268976, at *5 (S.D. Fla. Feb. 26, 2019). Accordingly, in reconciling these two provisions of the Operating Agreement, the Court determines that, while Plaintiffs must submit their claims raised in this action against Real Distribution to mediation and/or arbitration under the mediation and arbitration provision of the Operating Agreement if they wish to proceed, the Court nonetheless had jurisdiction to enter the TRO against Real Distribution and has jurisdiction to rule on the merits of the pending Motion for Preliminary Injunction against Real Distribution.

Real Dismissal Order at 4-5.

The District Court's determination is likely the law of the case. Even if it is not, I agree with the District Court's determination, which equally applies here. Under the law of the case doctrine, "'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case' unless the original decision was 'clearly erroneous and would work a manifest injustice.'" *Bank of Mongolia v. M&P Glob. Fin. Servs.*, No. 08-60623, 2011 WL 13175071, at *3 (S.D. Fla. Nov. 16, 2011), *aff'd*, 482 F. App'x 411 (11th Cir. 2012) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816-17 (1988)).

4

The District Court decided a question of law (in the context of a motion to dismiss, a dispositive motion) in interpreting the Operating Agreement. *See Dear v. Q Club Hotel, LLC*, 933 F.3d 1286, 1293 (11th Cir. 2019) ("The interpretation of a contract is a question of law."). Not only is the District Court's interpretation not clearly erroneous, but I interpret the Operating Agreement in the same way as the District Court. Therefore, the Operating Agreement did not prevent the Court from entering the TRO, and it does not prevent the Court from entertaining Plaintiffs' request for a preliminary injunction.

Even if the interpretation issue had been decided in Defendants' favor, it would not leave the Court without subject matter jurisdiction. *See Tracfone Wireless, Inc. v. Blue Ocean's Distrib., LLC*, 616 F. Supp. 2d 1284, 1285 (S.D. Fla. 2009) ("While valid arbitration clauses are to be enforced under the Federal Arbitration Act, 9 U.S.C. § 3, they do not oust district courts of their jurisdiction."); *Frank v. Am. Gen. Fin., Inc.*, 23 F. Supp. 2d 1346, 1349 (S.D. Ala. 1998) ("[T]he mere existence of an arbitration agreement does not divest a court, state or federal, of jurisdiction."). Importantly, a contractual right to arbitration is different from the issue of subject matter jurisdiction. A contractual right to arbitration can be waived. *See Johnson v. Orkin, LLC*, 556 F. App'x 543, 544 (7th Cir. 2014) ("An arbitration agreement, however, *can* be waived by the parties, so the effect of such an agreement on a lawsuit is not jurisdictional."). Subject matter jurisdiction, however, "cannot be waived or otherwise conferred upon the court by the parties." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). Here, the Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. The fact that an

arbitration agreement exists does not change that.  Therefore, the Court's determinations in the Real Dismissal Order should equally apply to Gigi and Zroya.[2]

## PI MOTION

### I.    FINDINGS OF FACT

Having considered and weighed all of the evidence presented both in the record and at the evidentiary hearings,[3] having considered the credibility of witnesses, and having considered the parties' arguments and post-hearing submissions, I make the following findings of fact.

#### A.  Fume Background

Gigi and Zroya founded Fume, a South Carolina limited liability company, in 2019.  Real PI Order at 2, ¶ 1; Stipulation at 1, ¶¶ 2-3.  ADJ, which is controlled by Joseph Isaacoff

---

[2] I make two final observations regarding the Motion to Dismiss.  First, there is no need to reach Gigi's and Zroya's separate request for dismissal under Rule 12(b)(6) for the same reasons the District Court did not decide the issue in the context of Real Distribution's motion to dismiss.  *See* Real Dismissal Order at 5 n.1.  Second, since the Court has already decided to dismiss the case as to Real Distribution (rather than staying it), the Court should likewise dismiss the case against Gigi and Zroya (thus dismissing the case in its entirety, without prejudice, in favor of mediation/arbitration).  The only caveat is that a stay would likely be more appropriate than dismissal if the Court enters a preliminary injunction against Gigi and Zroya.  However, as discussed below, I am recommending that Plaintiffs' request for a preliminary injunction against Gigi and Zroya be denied.

[3] Based on Plaintiffs' request and Gigi's and Zroya's acquiescence (or at least lack of objection), I have considered both the evidence presented through affidavits/declarations and the evidence presented at the evidentiary hearing sessions on October 28, 2021, November 1, 2021, and November 29, 2021.  I note that I was only present for the November 29, 2021 evidentiary hearing, as the earlier hearing sessions were held before the District Court.  However, I have reviewed the transcripts from the earlier evidentiary hearing sessions that were held before the District Court.  Moreover, although I was not present for the earlier sessions, I had the opportunity to observe the demeanor of all but one (Avi Solaymanov) of the witnesses who testified at the earlier sessions as they also testified at the all-day evidentiary hearing on November 29, 2021.  With respect to Solaymanov, it appears from the transcript of his testimony that cross-examination fairly effectively undermined certain significant contentions Solaymanov made during his direct examination.  With respect to the evidence presented via affidavits, I note, like the District Court, *see* Real PI Order at 2 n.1, that the evidence presented at the evidentiary hearings has impacted my view and understanding of the evidence.

("Isaacoff"), became the third member of Fume in December 2020.  Real PI Order at 2, ¶ 1; Stipulation at 1, ¶ 4.  Fume currently operates under the Operating Agreement, which Gigi, Zroya, and Isaacoff (on behalf of ADJ) signed in December 2020; Gigi and Zroya signed as both members and managers.  Real PI Order at 2, ¶ 2; Stipulation at 2, ¶ 8; Ex. P-1 at 37.  As reflected in Exhibit "A" of the Operating Agreement, ADJ owns a 50% interest in Fume, and Gigi and Zroya each own a 25% interest.  Ex. P-1 at 38.  ADJ acquired its interest after investing $6 million in Fume.  T3 at 139.[4]  Nonetheless, Gigi and Zroya served as managers of Fume until their removal as managers on or around July 2, 2021.  *See, e.g.*, Stipulation at 3, ¶ 12.  They were in charge of Fume's day-to-day operations while serving as managers.  *See id.* at 2, ¶ 7.  Even after their removal as managers, Gigi and Zroya continued to be in charge of, and exercise control over, many day-to-day operations of Fume until sometime in September 2021.  Declaration of Defendant Yakov Zroya ("Zroya Decl.") [DE 97-1] ¶ 59; Declaration of Defendant Israel Isaac Gigi ("Gigi Decl.") [DE 97-2] ¶ 58.  *See also* T2 at 94-95.  However, they have now been locked out of Fume, *see* Zroya Decl. ¶ 51, Gigi Decl. ¶ 51, and they no longer have access to Fume bank accounts.  Declaration of Joseph Tempelberg ("Tempelberg Decl."), [DE 8-1] at 66-70, ¶ 14.

Fume was and is engaged in the business of developing and wholesaling vape products and creating related intellectual property by and through proprietary systems, processes, methods, and other trade secrets.  Real PI Order at 3, ¶ 4; Stipulation at 2, ¶ 5.  The only vape product Fume presently sells is the Fume brand.  Real PI Order at 3, ¶ 4; Stipulation at 2, ¶ 5.  It only sells product to distributors, not downstream to individual stores.  Real PI Order at 3, ¶ 6; Stipulation at 2, ¶ 11.  Fume is located at 2400 Southwest 30th Avenue in Hallandale Beach, Florida, which is the address

---

[4] The October 28, 2021 transcript [DE 94-49] will be cited as "T1."  The November 1, 2021 transcript [DE 94-50] will be cited as "T2."  The November 29, 2021 transcript [DE 103] will be cited as "T3."

of Fume's only warehouse.  Real PI Order at 3, ¶ 3; Stipulation at 2, ¶ 9.  At some point around mid-September 2021, Fume ran out of product, and it has been unable to obtain additional product. *See, e.g.*, Real PI Order at 7 ¶ 36.  *See also* T2 at 17.  Customers have been calling Fume to complain about being unable to obtain product, expressing confusion that others are apparently able to obtain product.  T3 at 71-72; Real PI Order at 7, ¶¶ 37-39.  Additionally, Fume has had to cut its staff due to its inability to obtain product to sell to customers.  T3 at 72; Real PI Order at 7, ¶ 40.

### B.  Shipment of Product to Fume

Fume purchases its product from BFL Metals ("BFL"), a company in China.  *See* T3 at 59-60.  Fume product from BFL was received in customs, shipped by Afex Logistics ("Afex") to Fume's warehouse in Hallandale Beach, Florida, cataloged at the warehouse, and then shelved for sale.  Real PI Order at 3, ¶ 10; T2 at 33.  Fume product was intended to, and should only, come through Fume's Hallandale Beach, Florida warehouse. Fume's chain of custody process is important to ensure products are correct and of acceptable quality assurance standards.  Unchecked products raise concerns for Fume, LLC due to dangerous and/or fake products that have infiltrated the general vape market.  Real PI Order at 3-4, ¶ 11; T2 at 33-34.  Zroya dealt with BFL and Afex on behalf of Fume until at least September 2021.  Real PI Order at 3, ¶ 9; T3 at 61, 70-71.  Afex refuses to speak with anyone at Fume other than Zroya.  T3 at 71.

Paltiel Ratzenberg ("Ratzenberg"), Fume's director of operations, testified at all three evidentiary hearing sessions.  He is responsible for day-to-day operational functions, such as application of payments, invoice review, and coordinating with accounting, bookkeeping, and logistics.  Real PI Order at 3, ¶ 8; Stipulation at 5, ¶ 32.  Ratzenberg testified that there is an $8 million discrepancy between the amount Fume has paid to BFL and the amount of product that

Fume has actually received from BFL.  T3 at 69-70, 75-76.  He (and Fume) believe that Gigi and Zroya have somehow diverted product that has been shipped to the United States to themselves (or their other companies).  *See* T3 at 81-82.  Various BFL invoices from the first two weeks of September 2021 included a non-Fume address in Miami, Florida that had not been previously listed in BFL's invoices.  *See* Ex P-17.  However, there was no credible evidence tying the address to Gigi, Zroya, or any of their companies.  *See, e.g.*, T3 at 30.  Ultimately, while Fume's diversion theory is perhaps not completely unfounded, there is nothing more than weak circumstantial evidence (and really only speculation) that has been presented to support it.  Based on the evidence presented, I find that Plaintiffs have not demonstrated a substantial likelihood of establishing that Gigi and Zroya have diverted shipments of product to themselves or their other companies.  In fact, Ratzenberg acknowledged that he does not "have personal proof of them receiving it."  T3 at 82.  He likewise acknowledged that he does not have any knowledge of Real Distribution (Gigi's and Zroya's company discussed further in Section C.1 below) doing any business directly with BFL or Afex.  T2 at 28-29.

    **C.  Gigi's and Zroya's Other Companies**

    Gigi and Zroya also hold interests in other companies, including Real Distribution and U.S. Speed Wheel, LLC d/b/a I&K Wholesale ("I&K").  No credible evidence was submitted for the Court to find that – since ADJ became a member of Fume – Gigi or Zroya, personally or through their non-Fume companies, (1) imported Fume products to themselves, (2) intercepted Fume products at customs, (3) distributed, sold, acquired, or possessed any Fume product that was not acquired directly from Fume, or (4) possessed or sold any counterfeit Fume product.

### 1. Real Distribution

Real Distribution was formed on June 3, 2021.  Real PI Order at 4, ¶ 13; Stipulation at 3, ¶ 15.  It is a Florida limited liability company with three members: (1) Ami Atiya ("Atiya"); (2) Gigi; and (3) Zroya.  Real PI Order at 4, ¶ 13; Stipulation at 3, ¶ 13.  Gigi and Zroya each own an interest of approximately 16% or 17% in Real Distribution, and Atiya owns the remaining interest of 66% to 68%.  Zroya Decl. ¶¶ 2, 28; Gigi Decl. ¶¶ 2, 28; T2 at 84-85.

Real Distribution was a customer of Fume.  T2 at 99.  Gigi and Zroya, however, did not inform Fume and/or Fume's employees of their ownership or involvement in Real Distribution.  Real PI Order at 4, ¶ 14.  *See also* T2 at 75.  Instead, Real Distribution was represented to be a local New Jersey distributor.  Real PI Order at 4, ¶ 15; Stipulation at 3, ¶ 16.  Although Plaintiffs knew that Real Distribution was a Fume customer, they did not know about Gigi's and Zroya's interests in Real Distribution.  *See, e.g.*, T2 at 42; T3 at 50.  Based on the evidence presented, I find that Gigi and Zroya concealed their interests and involvement in Real Distribution from Plaintiffs.[5]

Real Distribution was one of Fume's newer distributors.  T3 at 105.  It is not a wholesaler of Fume product.  T2 at 98-99.  Nor is there any credible evidence that it is a wholesaler of any other vape product.  Real Distribution sold Fume product to individual stores, including smoke shops, gas stations, corner stores, and vape shops.  Real PI Order at 4, ¶ 19.  No credible evidence was submitted for the Court to find that Real Distribution purchased products from Fume below the market price or that Real Distribution sold Fume products below market rates.  Notably, Ratzenberg has acknowledged that pricing for Real Distribution was at market price.  T3 at 83.

---

[5] Whether they had a legal obligation to disclose their interests and involvement is addressed in the Analysis section below.

Other than Fume vape products, Real Distribution does not sell/distribute other vape products.  T2 at 84.  In addition to distributing Fume product acquired from Fume, Real Distribution sells Kratom and Delta-8 products, neither of which is a nicotine or vape product.  *Id.* Based on the evidence presented, I find that Plaintiffs are unlikely to establish that Real Distribution is a competitor of Fume.  It certainly is not in direct competition with Fume.

Real Distribution will not agree to not sell Fume product.  Real PI Order at 5, ¶ 20; Stipulation at 6, ¶ 45.  However, there is no credible evidence that Real Distribution currently has any Fume product or that it has purchased any unauthorized Fume product.  Notably, Joseph Tempelberg ("Tempelberg"), the CFO of both Fume and ADJ, has acknowledged that he does not have personal knowledge of Real Distribution acquiring Fume product from anyone other than Fume, T2 at 56-58, T3 at 195, and there is no credible evidence that Real Distribution has acquired Fume product from anyone other than Fume.

Fume issued five separate invoices to Real Distribution for the Fume product it sold to Real Distribution, but Real Distribution only paid the first invoice.  Real PI Order at 4, ¶¶ 16, 18; Stipulation at 6, ¶ 43.  As such, Real Distribution owes Fume a balance of $383,245.  Real PI Order at 4, ¶ 18; Ex. P-15; Ex. P-15b.  *See also* T2 at 7-9; T3 at 106.  While a substantial balance, it is small in comparison to the balance owed by several other Fume distributors with open invoices. *See* Real PI Order at 4, ¶ 18.  For each invoice, Gigi was listed at the sales representative.  *See* Ex. P-15.  As such, he received a commission for the invoice that was paid.  T2 at 10-11.  With respect to unpaid invoices, when Ratzenberg asked Gigi to reach out to Real Distribution to inquire regarding payment, Gigi said he would call "them," continuing to keep Fume in the dark regarding his ties to Real Distribution.  T3 at 51.

## 2.  I&K

 I&K (which Fume sometimes refers to as Kobi, Myrtle Beach) is a South Carolina limited liability company that was formed in 2015.  Zroya Decl. ¶ 9; Gigi Decl. ¶ 9.  Gigi and Zroya each own a 50% interest in I&K.  Zroya Decl. ¶ 3; Gigi Decl. ¶ 3.  ADJ was aware of Gigi's and Zroya's interests in I&K when ADJ became a member of Fume.  T2 at 63; T3 at 197-98.

Based on the evidence presented, I find that Plaintiffs have not shown that I&K is a competitor of Fume.  I&K was Fume's original distributor, which ADJ knew.  T2 at 63, 98; T3 at 197-98.  I&K purchased Fume product from Fume, but there is very little evidence of the types of customers to which I&K would then sell product.  There is no credible evidence that I&K sold Fume product or other vape product to any customers or potential customers of Fume.  Instead, I&K appears to sell product to types of customers that would not be directly serviced by Fume.  *See* T3 at 316-17.  In fact, Gigi and Zroya previously moved I&K customers over to Fume (apparently prior to or around the time of ADJ becoming a member of Fume).  T3 at 266, 316-17.

I&K did purchase product from Fume at below market/discounted rates (for approximately Fume's cost) – T2 at 97-98; T3 at 83, 199, 231 – but there is no credible evidence that I&K sold Fume product at below market rates.  Regardless, Fume and ADJ were aware of the amounts I&K was being billed by Fume for product.  Moreover, although I&K purchased product from Fume almost 50 times between March 2021 and September 2021, *see* Ex. P-20, there is no credible evidence of ADJ objecting to, or stopping, any such sales while they were occurring.  Ratzenberg testified that Fume only continued to ship product to I&K because Gigi and Zroya represented that they had worked out issues relating to I&K's outstanding balances among Fume's partners (i.e., that Fume relied on Gigi's and Zroya's representations).  *See* T3 at 54.  However, I do not find Ratzenberg's contention regarding reliance by Fume to be credible.  While Gigi and Zroya were

also not fully credible, Raztenberg's and Tempelberg's testimony that Gigi's and Zroya's representations were false on this score was not convincing. For instance, when asked about conversations between the Fume partners regarding the provision of Fume product to I&K, Tempelberg testified he could not recall all the details of what the Fume partners discussed or whether he was present for all such conversations. *See, e.g.*, T3 at 201. Given the evidence before the Court, for Plaintiffs to have established that Gigi's and Zroya's I&K representations were false representations or misrepresentations of material fact, they would have needed to do so through Isaacoff's live testimony. Without Isaacoff's live testimony, I cannot find that Gigi's and Zroya's representations to Fume employees regarding I&K were false.

There is also no credible evidence that I&K currently has any Fume product or that it has acquired any Fume product from anyone other than Fume since ADJ became a member of Fume. Tempelberg has acknowledged that he does not have knowledge of I&K acquiring Fume product from anyone other than Fume. T3 at 195. For the product that I&K has purchased from Fume, it has been billed $3,038,735 and has paid $280,970. T3 at 53; Ex. P-20b. As such, Plaintiffs contend that I&K has a balance of $2,757,765. T3 at 53, 216; Ex. P-20b. However, Gigi and Zroya contend that I&K's balance has been satisfied or forgiven. Specifically, they contend that they have been credited with distributions (from Fume) totaling $2,000,000 to satisfy most of the balance and that the rest of the balance has been satisfied or forgiven on account of amounts they expended for Fume. *See* T3 at 229-33.

### D. Investigation of Defendants

In August 2021, ADJ hired A Action and Investigations and Security ("A Action"), which specializes in intellectual property investigations, to investigate Gigi and Zroya, to look into former Fume employees, and to locate unauthorized Fume product in any unauthorized warehouses. Real

PI Order at 5, ¶ 21; Stipulation at 3, ¶¶ 18-19.  A Action's president, Eric Berger ("Berger"), testified at the evidentiary hearing sessions on October 28, 2021 and November 29, 2021.  I found his testimony to be largely credible.[6]

Berger and/or his team conducted surveillance on Real Distribution – at 1300 Stirling Road, Number 7A in Dania Beach, Florida – to ascertain whether Real Distribution had unauthorized Fume product.  Real PI Order at 5, ¶ 22; Stipulation at 3, ¶¶ 20-21.  Mr. Berger also subsequently conducted surveillance at 3026 and 3040 SW 42nd Street in Fort Lauderdale, Florida (hereinafter referred to individually as the "3026 Address" and "3040 Address," and collectively as the "3026 and 3040 Addresses").  Real PI Order at 5, ¶ 22; Stipulation at 4, ¶ 23.  Fume's sales director, Avi Solaymanov ("Solaymanov"), who testified at the October 28, 2021 hearing, assisted Berger with identifying current and former Fume employees during Berger's surveillance.  Real PI Order at 5, ¶ 22; Stipulation at 4, ¶ 22.

At the 3040 Address, Berger observed a sign in the window saying Utopia Supply and Beauty.  T1 at 13.  He also observed vehicles behind the business belonging to Moshe Amir and Aviad Zaken ("Zaken"), both former Fume employees.  T1 at 13-14.  At the 3026 Address, Berger observed vehicles belonging to Gigi and Edan Caspi, a former Fume employee.  T1 at 16. Additionally, in the back of the parking lot by the 3026 Address, Berger saw three individuals

---

[6] Berger was more credible than all other witnesses except for Orit Deverell, who was the most credible witness.  However, I place little weight on much of Berger's testimony *regarding BFL and Afex*, and in particular, on statements like those at the beginning of paragraphs 17 and 18 of his declaration, [DE 8-1] at 85-92 ("Berger Decl."), that he learned Zroya purchased Fume product from BFL and that he learned Gigi and Zroya used Afex to import Fume product into the United States.  *See* T3 at 27-34.  I place little weight on such statements because they are not based on Berger's personal knowledge; rather, they are based on seemingly speculative assertions made by Plaintiffs for which they have presented no further supporting evidence.

throw boxes, which he later identified as boxes that had contained Fume product, into the dumpster. *See* T1 at 17-18. However, Berger did not actually see any Fume product. T1 at 30.

During the course of Berger's investigation, Berger also set up a confidential informant buy from Real Distribution to determine whether Real Distribution had unauthorized Fume products. Real PI Order at 5, ¶ 23; Stipulation at 4, ¶ 24; T1 at 19-20. On or about September 23, 2021, Real Distribution agreed to sell Fume products to the confidential buyer, accepting an order for approximately $240,000 of Fume products. Real PI Order at 5, ¶ 24; T1 at 19-20; Ex. P-24. The confidential informant ordered the product from Zaken and received an invoice from Real Distribution. T1 at 20-21; Ex. P-24. However, the sale did not go through because Real Distribution refused to, or was unable to, complete the order. *See* Real PI Order at 5, ¶ 24; T1 at 24; T2 at 75-77; T3 at 15.

On or about September 22, 2021 (the day before Real Distribution agreed to sell product to the confidential buyer), however, an undercover purchase of Fume product had been made from Taj Wholesale, LLC ("Taj"), a customer of Fume. Berger Decl. ¶ 14; Real PI Order at 5, ¶ 25; Stipulation at 4, ¶¶ 25, 27, 29; T3 at 15-16. The Taj purchase consisted of $1,947.50 in Fume product. Berger Decl. ¶ 14. Taj possessed genuine Fume product, and the Fume product purchased from Taj was genuine Fume product. Real PI Order at 5, ¶ 25; Stipulation at 4, ¶ 26. According to a Taj employee (based on what appears to be multiple layers of hearsay), Taj acquired the Fume product – that it sold in the undercover purchase – from Real Distribution (through Zaken). *See* T1 at 33-34, 38; Berger Decl. ¶ 15; Real PI Order at 5, ¶ 25. Gigi, however, testified that Real Distribution did not sell any product to Taj. T2 at 75-76; T3 at 224-25. While I did not find Gigi (or Zroya or many of Plaintiffs' witnesses) to be completely credible, I cannot find that Real Distribution sold Fume product to Taj, as the only evidence that it did is very weak and

unconvincing.  Instead, I find that the evidence failed to show that Gigi, Zroya, or their non-Fume companies actually sold Fume product to Fume's customers or potential customers.  In other words, the evidence does not show that they fulfilled any orders for Fume product that Fume would have fulfilled.

### E.  Additional Allegations of Wrongdoing

#### 1.  Purchase of Luxury Watches[7]

Around April 2021, Isaacoff (ADJ's owner) offered Gigi and Zroya the opportunity to purchase watches, which would be charged as distributions to Gigi and Zroya.  ADJ specifically authorized Gigi and Zroya to purchase certain watches for approximately $160,000, with Fume paying for the watches.  However, Gigi and Zroya chose not to purchase the selected watches because they were concerned about scratches on the watches.  Instead, they purchased – from a different vendor – watches that they considered to be in better condition.  A Fume check for $178,000 was issued to pay for the watches.  Although ADJ did not expressly authorize Gigi and Zroya to spend $178,000 in advance, ADJ did authorize Gigi and Zroya to purchase similarly-priced watches.  Moreover, ADJ consented to the $178,000 watch purchase after the fact (even though it claims it only did so to "keep the peace").  Fume has booked distributions to Gigi and Zroya in the amount paid for the watches.

#### 2.  Purchase of Luxury Vehicle[8]

In early or mid-2021, Isaacoff/ADJ suggested and authorized the lease of a company car for Zroya.  Unsatisfied with the Cadillac Escalade he had received, Zroya instead purchased a

---

[7] *See* T2 at 60-62; T3 at 144-46, 191-93, 239-41, 271; Ex. P-4; Ex. P-5; Ex. P-6; Ex. D-20; Ex. D-21.

[8] *See* T3 at 157-58, 194, 247-49, 269-71; Ex. D-26.

Mercedes S-Class vehicle using a Fume card. He did not obtain authorization to do so. Although Fume has booked a distribution to Zroya for the purchase price of the vehicle, ADJ never consented to the purchase of the vehicle in advance or after the fact.

### 3. Withdrawal of $6 Million Cashier's Check[9]

On July 1, 2021, Fume's members unanimously agreed to send BFL $2 million that Fume owed BFL. However, Ratzenberg and Tempelberg refused to wire the funds to BFL, so Gigi and Zroya went to Fume's bank, Optimum Bank, to request the wire on July 2, 2021. The bank apparently could not or would not approve their request for a wire, but it permitted them to withdraw funds via a cashier's check. Gigi and Zroya withdrew $6,000,000 rather than a sum closer to the $2,000,000 needed for the wire. Nonetheless, the cashier's check was made payable to Fume, and Gigi and Zroya deposited the funds into a bank account that they set up at another bank, First Horizon Bank, in Fume's name. After depositing the funds, Gigi and Zroya sent the $2,000,000 to BFL. As managers of Fume at the time of the withdrawal – they were removed as managers later that day or shortly thereafter – Gigi and Zroya were authorized to act as they did in withdrawing the funds and depositing the funds into a Fume account under section 13.1 of the Operating Agreement. The $2,000,000 BFL payment they initiated was also authorized.

Problems ensued. After the $2,000,000 payment was sent to BFL, the bank realized that there was an issue with the endorsement on the cashier's check. Therefore, the $6,000,000 deposit did not clear, and the account had a negative $2,000,000 balance. To cover the negative balance, ADJ wired $2,000,000 into the account. Separately, Gigi and Zroya were removed as managers (ADJ was permitted to remove them as managers under the Operating Agreement). Additionally,

---

[9] *See* T3 at 146-56, 175-84, 187-90, 243-47; Ex. P-7; Ex. P-9; Ex. P-10; Ex. P-11; Zroya Decl. ¶¶ 93-101; Gigi Decl. ¶¶ 87-95; Tempelberg Decl. ¶ 12; Declaration of Joseph Isaacoff ("Isaacoff Decl."), [DE 8-1] at 2-17, ¶¶ 22-26.

Fume, through its counsel, demanded that Gigi and Zroya return the $6,000,000 withdrawn from the Optimum account to Fume by July 6, 2021, which they did on, or within a few days after, that date. While Tempelberg testified that Fume and ADJ paid $8,000,000 and only received $6,000,000 back, that is because the other $2,000,000 was properly sent to BFL. Tempelberg ultimately acknowledged that Fume has the $6,000,000, that the $2,000,000 payment was always supposed to go to BFL, and that Fume and ADJ were in the position they were intended to be in once the $6,000,000 was returned.

### 4. Rosh Hashanah Shipment

Rosh Hashanah is the Jewish New Year and one of the Jewish high holidays. In 2021, it began on the evening of September 6, 2021, and it concluded on the evening of September 8, 2021. Certain members of the Jewish community do not drive, use electronics, or work on Rosh Hashanah. Consequently, during the Rosh Hashanah holiday, virtually all of Fume's employees were absent from work.

However, Vilma, a secretary employed by Fume, was at the warehouse on Rosh Hashanah in case any shipments came in during the holiday. Stipulation at 5, ¶ 35; T1 at 83-84. Another Fume employee, Anton, was also at the warehouse. Stipulation at 5, ¶ 37. A shipment did in fact come in from China, but Zroya and some non-Fume employees, who also came into the warehouse, then shipped out a substantial amount of product. *See* T1 at 88-89; T3 at 44-47. The product shipped out of the warehouse during Rosh Hashanah consisted of four to five pallets, a weight of approximately 5,600 pounds. Stipulation at 5, ¶ 38. No invoice was generated. T3 at 45.

The product that was shipped out was sent to I&K's warehouse in South Carolina. *See, e.g.*, T1 at 91; Ex. P-14. However, it was shipped there for Warlock Vapes, LLC d/b/a Zuluvape, LLC ("Zuluvape"), a South Carolina customer of Fume. Zuluvape is one of Fume's largest

distributors (T3 at 91) that has purchased millions of dollars of product from Fume but that did not have its own warehouse until very recently.  *See* T3 at 302-12.  In fact, Orit Deverell ("Deverell") – the most credible witness at the evidentiary hearing, who testified on behalf of Zuluvape – stated that Zuluvape's shipments from Fume were historically sent to I&K's warehouse.  T3 at 303-04. With respect to the Rosh Hashanah shipment, Deverell testified that Zuluvape received approximately $330,000 worth of product, or nearly 6,000 pounds, for which Zuluvape had not yet received an invoice from Fume.  T3 at 305.  Moreover, Deverell credibly testified that Zuluvape intends to pay for the product once it is invoiced and payment is due.  T3 at 306, 312.

There was certainly nothing ordinary about how Zroya conducted matters on Rosh Hashanah.  Some of the evidence does suggest that Zroya attempted to conceal the Rosh Hashanah events from ADJ and Fume's other higher-ups (excluding Gigi).  However, other evidence suggests that Zroya is technologically-challenged and that he was merely sloppy in not properly documenting what occurred and in generating an invoice.  Regardless, based on Deverell's credible testimony, I find that the product shipped out of Fume's warehouse on Rosh Hashanah was sent to its customer, Zuluvape – who has acknowledged receipt and agreed to pay for the product – and that Zroya and Gigi did not steal the product.  Additionally, aside from Fume product that Zuluvape acquired from Fume, there is no credible evidence that Zuluvape has otherwise acquired Fume product from Gigi, Zroya, or their other companies since ADJ became a member of Fume.

### 5.  Atlantic City Trade Show

Fume attends trade shows within the industry to generate marketing awareness and, ultimately, generate sales.  Real PI Order at 6, ¶ 31.  From August 31 to September 2 of 2021, Fume had a booth at the C.H.A.M.P.S. Trade Show in Atlantic City, New Jersey.  *Id.*  Gigi was in charge of coordinating Fume's team at the Atlantic City trade show.  *Id.*  In the Fume booth were

various non-Fume members who were utilizing order forms with Real Distribution branding on them and handing out Real Distribution business cards. *Id.* ¶ 32. Gigi led Fume project manager Moshe Ben Ohayon ("Ohayon") to believe that Real Distribution was simply a local distributor who Fume had partnered with to handle the smaller orders. *Id.*

> As indicated in the Real PI Order, the District Court found:
>
> No credible evidence was submitted for the Court to find that Real Distribution diverted Fume customers at the Atlantic City trade show with large enough orders to have been accepted by Fume. No credible evidence was submitted for the Court to find that any or all orders taken by Real Distribution in connection with that trade show would not have been filled with Fume product Real Distribution acquired directly from Fume.

*Id.* at 6-7, ¶ 33. Having considered the same evidence that the District Court considered as well as the additional evidence presented at the November 29, 2021 evidentiary hearing, I agree with the foregoing findings. In fact, Ohayon confirmed at the November 29 hearing that he did not know whether any business was being taken away from Fume. T3 at 119.

## II.   PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an extraordinary remedy. *Harbourside Place, LLC v. Town of Jupiter, Fla.*, 958 F.3d 1308, 1313 (11th Cir. 2020). It has been characterized as "the exception rather than the rule." *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983). A party seeking a preliminary injunction must establish: "(1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable injury unless the injunction is issued; (3) that the threatened injury outweighs possible harm that the injunction may cause the opposing party; and (4) that the injunction would not disserve the public interest." *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1322 (11th Cir. 2015) (citing *Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1262-63 (11th Cir. 2004)). The movant must "clearly carr[y] its burden of persuasion"

as to all four requirements to obtain a preliminary injunction. *Id.* (quoting *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001)).

### III.   ANALYSIS

Plaintiffs have failed to meet their burden of showing that they are entitled to injunctive relief.  They have failed to establish a substantial likelihood of succeeding on most of their claims, and they have failed to show that they are likely to prove most of the wrongdoing they have alleged. As to the limited wrongdoing Plaintiffs have demonstrated they are likely to prove, such wrongdoing will not cause irreparable injury absent an injunction.  The first two injunctive relief requirements – substantial likelihood of success and irreparable harm – are discussed in further detail below.  While the failure to establish irreparable harm precludes injunctive relief, I also conclude, based on the findings of fact above and discussion below, that the threatened injury to Plaintiffs does not outweigh the harm that injunctive relief may cause Gigi and Zroya.

### A.  Substantial Likelihood of Success

Plaintiffs contend that they have established a substantial likelihood of success on the merits of their claims against Gigi and Zroya for breach of fiduciary duty, tortious interference, fraudulent and negligent misrepresentation, fraud by nondisclosure, conversion, breach of contract, and conspiracy.  [DE 108] at 14.[10]  Accordingly, in addressing the merits of their claims

---

[10] Plaintiffs do not appear to contend that they have established a substantial likelihood of success on their trademark claims (without any waiver of such claims).  Nonetheless, even if they had, any such contention would fail for the reasons articulated by the District Court.  *See* Real PI Order at 8, ¶ 5.  Although the District Court's determination regarding the trademark claims was limited to Real Distribution, I find that it also applies to Gigi and Zroya.  In other words, Plaintiffs failed to show they are likely to prove that Gigi and Zroya sold, induced the sale of, or marketed any products bearing its marks, or confusingly similar marks, without Fume's permission, or that Gigi and Zroya sold unauthorized or counterfeit Fume products.

in the conclusions of law section of their Proposed Findings of Fact and Conclusions of Law, Plaintiffs address the claims in Counts 6-16 of the Complaint. *See* [DE 107] at 51-73.

As discussed herein, based on the findings of fact above, Fume is substantially likely to succeed in establishing liability for breach of fiduciary duty and fraud by nondisclosure based upon Gigi's and Zroya's concealment of their interests and involvement in Real Distribution. However, Fume is unlikely to succeed in establishing the bulk of its allegations related to these two claims, and it is unlikely to succeed on all of its other claims. As to ADJ, it is substantially likely to succeed in showing that Zroya's purchase of the Mercedes breached the Operating Agreement, but it is unlikely to otherwise succeed on its claims against Gigi and Zroya.

### 1. Breach of Fiduciary Duty (Count 6)

Fume has established a substantial likelihood of success as to its claim for breach of fiduciary duty, albeit only with respect to certain allegations made in support of the claim. Under South Carolina law,[11] a plaintiff must establish the following elements to prevail on a breach of fiduciary duty claim: "(1) the existence of a fiduciary duty, (2) a breach of that duty owed to the plaintiff by the defendant, and (3) damages proximately resulting from the wrongful conduct of the defendant." *Scott v. Catawba Valley Brewing Co.*, No. 2:18-CV-1539-RMG, 2018 WL 3966261, at *3 (D.S.C. Aug. 17, 2018) (quoting *RFT Mgmt. Co. v. Tinsley & Adams L.L.P.*, 732 S.E.2d 166, 173 (S.C. 2012)).

While serving as managers of Fume, Gigi and Zroya owed a fiduciary duty to Fume. *See Jensen v. Thompson*, No. 17-CV-4014-LLP, 2018 WL 1440329, at *22 (D.S.D. Mar. 22, 2018) ("Under South Carolina law, a manager of a manager-managed LLC owes statutory duties of care,

---

[11] As indicated above, Fume is a South Carolina limited liability company. Nonetheless, the result – as to substantial likelihood of success – would be the same under Florida law.

loyalty, and good faith and fair dealing not only to the company, but also to the company's other members." (citing S.C. Code Ann. § 33-44-409)); *Brandon Mill, LLC v. Fed. Deposit Ins. Corp.*, No. CV 18-2308 (RMC), 2019 WL 3458688, at *7 (D.D.C. July 31, 2019), *aff'd*, 831 F. App'x 526 (D.C. Cir. 2020) ("[I]n manager-managed [South Carolina] LLCs, the manager owes these fiduciary duties to members."). Gigi and Zroya served as managers until at least July 2, 2021, though they still continued to control many day-to-day operations of Fume until sometime in September 2021.

Fume contends that Gigi and Zroya breached their fiduciary duties to Fume for several different reasons. Fume's most significant contentions concern Gigi's and Zroya's operation of competing companies. As discussed above, however, Fume has failed to establish that Gigi and Zroya competed with Fume personally or through I&K or Real Distribution. Consequently, as discussed further below (in addressing the breach of contract claim), Fume has failed to show that Gigi and Zroya's conduct related to I&K and Real Distribution violated the Operating Agreement.[12] Nonetheless, even if Gigi and Zroya were not obligated under section 6.6 of the Operating Agreement to offer Fume or ADJ the opportunity to participate in Real Distribution or to obtain ADJ's consent to participate in Real Distribution, that did not bestow upon Gigi and Zroya a license to conceal their involvement in Real Distribution from Fume and ADJ. This is especially so given that Real Distribution did business with Fume, and even more significantly, owes Fume a substantial sum. Yet, while deriving a benefit from the relationship on both sides, Gigi and Zroya intentionally kept Fume and ADJ in the dark.

---

[12] As discussed below, the only violation of the Operating Agreement that Plaintiffs have a substantial likelihood of establishing concerns Zroya's purchase of the Mercedes with Fume funds.

### 2.  Fraud by Nondisclosure (Count 10)

Fume has shown that it has a substantial likelihood of success on the merits of its claim for fraud by nondisclosure for the reasons discussed in the preceding section.  "A defendant's knowing concealment or nondisclosure of a material fact may [] support an action for fraud where there is a duty to disclose."  *Gutter v. Wunker*, 631 So. 2d 1117, 1118 (Fla. 4th DCA 1994) (citing *Don Slack Ins., Inc. v. Fidelity & Cas. Co. of N.Y.*, 385 So. 2d 1061 (Fla. 5th DCA 1980)).  *See also State v. Mark Marks, P.A.*, 698 So. 2d 533, 539 (Fla. 1997) ("A fraud is committed for the failure to disclose material information only when there is a duty to disclose such; and such duty arises when one party has information that the other party has a right to know because of a fiduciary or other relation of trust or confidence between them." (citation omitted)).  Here, Gigi and Zroya had a duty to disclose their involvement in Real Distribution.  Fume and ADJ had a right to know this material information given the fiduciary relationship, but Gigi and Zroya intentionally concealed the information, and Fume continued to sell to Real Distribution, which now has an unpaid balance of $383,245 with Fume.

### 3.  Tortious Interference (Count 7)

Fume has failed to establish a substantial likelihood of success on the merits of its tortious interference claim.  Under Florida law, a plaintiff must establish the following elements to prevail on a claim for tortious interference with a business relationship: "(1) the existence of a business relationship under which the plaintiff has legal rights; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with that relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the business relationship." *Bortell v. White Mountains Ins. Grp., Ltd.*, 2 So. 3d 1041, 1048 (Fla. 4th DCA 2009) (quoting *N. Am. Van Lines, Inc. v. Ferguson Transp., Inc.*, 639 So. 2d 32, 33 (Fla. 4th DCA 1994)).

Fume has failed to establish the third and fourth elements. Its tortious interference claim appears to be primarily based on Gigi, Zroya, and/or their other companies allegedly selling Fume product to Taj and potentially other Fume customers. *See* Complaint ¶¶ 140-46; PI Motion at 35-36; [DE 107] at 54-57. However, as I found above, the evidence failed to establish that Gigi, Zroya, and/or their non-Fume companies actually sold Fume product to Taj or Fume's other customers. While Fume indicates that Taj and other customers have not recently purchased product from Fume, that appears to be the result of Fume's inability to obtain product from BFL to sell to customers (apparently due to a dispute between BFL and Fume). Regardless, the evidence failed to establish that Gigi or Zroya (or their non-Fume companies) caused Fume's customers to discontinue their relationship with Fume.

### 4. Fraudulent and Negligent Misrepresentation (Counts 8 and 9)

Fume has failed to demonstrate that it has a substantial likelihood of prevailing on these claims, which are based on the same alleged acts. Proving a fraudulent misrepresentation claim requires establishing the following elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (citation omitted). Proving a negligent misrepresentation claim requires establishing the following elements:

> (1) . . . a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation.

*White v. Fort Myers Beach Fire Control Dist.*, 302 So. 3d 1064, 1074 (Fla. 2d DCA 2020) (quoting *Baggett v. Electricians Local 915 Credit Union*, 620 So. 2d 784, 786 (Fla. 2d DCA 1993)).

Here, Fume's misrepresentation claims are based on Gigi's and Zroya's representations regarding the partners having worked out issues concerning the shipment of product to I&K and Fume relying on such representations in continuing to ship product to I&K.  *See* [DE 107] at 57-59.[13]  Based upon my findings and credibility determinations set forth in section C.2 of the Findings of Fact section above, Fume failed to establish any false representations or misrepresentations of material fact, as well as reliance (justifiable or otherwise) on Gigi's and Zroya's alleged representations.

### 5.  Conversion (Count 11)

Fume has failed to establish a substantial likelihood of success on the merits of its conversion claim.  "Under Florida law, a conversion is 'an unauthorized act which deprives another of his property permanently or for an indefinite time.'"  *Archer v. City of Winter Haven*, 846 F. App'x 759, 766 (11th Cir. 2021) (quoting *Fogade v. ENB Revocable Tr.*, 263 F.3d 1274, 1291 (11th Cir. 2001)).  "A conversion claim is based on a positive, overt act or acts of dominion or authority over the money or property inconsistent with and adverse to the rights of the true owner."  *Columbia Bank v. Turbeville*, 143 So. 3d 964, 969 (Fla. 1st DCA 2014) (internal quotation marks and citation omitted).  "The essence of conversion is not the possession of property but possession in conjunction with a present intent on the part of the wrongdoer to deprive the person entitled to possession of the property."  *Archer*, 846 F. App'x at 766 (quoting *Senfeld v. Bank of Nova Scotia Tr. Co. (Cayman)*, 450 So. 2d 1157, 1161 (Fla. 3d DCA 1984)) (cleaned up).

---

[13] The Complaint and PI Motion also reference misrepresentations regarding the watches and the withdrawal of the cashier's check from Optimum Bank.  However, these two issues are not included in the misrepresentation portion of Plaintiffs' post-hearing submission [DE 107].  Regardless, Fume has failed to establish a substantial likelihood of showing that Gigi and Zroya made the alleged misrepresentations of material fact regarding the watches and the withdrawal of the cashier's check.

In their proposed conclusions of law, Plaintiffs state that Gigi and Zroya possess(ed) Fume product through I&K and/or Real Distribution that legally belongs to Fume. [DE 107] at 64-65, ¶ 99. In support of this contention, Plaintiffs point to testimony regarding Real Distribution's failure to pay for four of the five invoices for product it purchased from Fume, as well as testimony regarding I&K's alleged balance of over $2.7 million owed to Fume for product purchased by I&K. *See id.* at 65 n. 492. Plaintiffs contend that Gigi's and Zroya's possession of Fume product through I&K and/or Real Distribution violates the Operating Agreement. *Id.* at 65, ¶ 100. Plaintiffs also assert that Gigi and Zroya diverted product from BFL that was intended for Fume. *Id.* ¶ 103. Additionally, although the conversion portion of Plaintiffs' conclusions of law does not explicitly reference the Rosh Hashanah shipment, the Rosh Hashanah shipment is referenced as a basis for the conversion claim in paragraph 148 of the PI Motion.

None of the foregoing establish a conversion claim. I&K and Real Distribution *purchased* product from Fume. Because they purchased product, Fume invoiced them. For any unpaid invoices, Fume may have a breach of contract claim against those entities, but not a conversion claim. Likewise, even if the Court were to assume that Gigi and Zroya breached the Operating Agreement on account of their companies' purchases of product from Fume, that does not give rise to a conversion claim. *See Douglas v. Braman Porsche Audi, Inc.*, 451 So. 2d 1038, 1039 (Fla. 3d DCA 1984) ("[A] mere obligation to pay money, generally, may not be enforced by a conversion action. Stated otherwise, an action in tort is inappropriate where the claim is based on a breach of contract."). With respect to the diversion of product from BFL, there is no credible evidence of any such diversion occurring. Finally, as to the Rosh Hashanah shipment, there was no intent to deprive Fume of its property. Rather, the product was shipped out for Zuluvape, and

Zuluvape has acknowledged that it will pay Fume for the product once payment becomes due. Accordingly, Fume is unlikely to prevail on its conversion claim.

### 6.   Breach of Contract (Count 14)

ADJ has established a substantial likelihood of prevailing on its breach of contract claim against Zroya with respect to Zroya's unauthorized purchase of the Mercedes using Fume funds. However, ADJ has failed to otherwise establish that it is substantially likely to succeed on its breach of contract claim.  "Under South Carolina law, '[t]he elements for a breach of contract are the existence of a contract, its breach, and damages caused by such breach.'"  *Lowery v. Metro. Life Ins. Co.*, No. 7:20-CV-1469-TMC, 2020 WL 10758551, at *5 (D.S.C. Dec. 23, 2020) (quoting *Hotel & Motel Holdings, LLC v. BJC Enters., LLC*, 780 S.E.2d 263, 272 (S.C. Ct. App. 2015)).[14]

ADJ contends that Gigi and Zroya breached sections 4.3, 6.3, and 6.6 of the Operating Agreement.  It alleges that they committed such breaches through their conduct related to the watches, Mercedes, and withdrawal of the $6 million check, and more significantly, by competing with Fume (through I&K and Real Distribution).  Based upon the findings of fact above, Gigi's and Zroya's conduct related to the watches and $6 million check did not violate the Operating Agreement.  Such conduct certainly did not rise to the level of a material breach.  As to the watches, ADJ consented to Gigi and Zroya purchasing similarly-priced watches in advance; regardless, ADJ consented to the purchase of the watches after the fact.  As to the $6 million check, Gigi's and Zroya's actions were permissible under Section 13.1 of the Operating Agreement.  Moreover, as discussed in section E.3 above, Tempelberg effectively acknowledged that the withdrawal did not

---

[14] As set forth in section 17.13 of the Operating Agreement, the Operating Agreement "shall be construed (both as to validity and performance) and enforced in accordance with, and governed by, the laws of the State of South Carolina applicable to contracts to be performed entirely within that State, without giving effect to the principles of conflicts of law."

ultimately cause damages. However, Zroya materially breached section 6.3 of the Operating Agreement by purchasing the Mercedes, using Fume's funds, without ADJ's authorization.

Turning to the issue of competition, it is addressed in both sections 4.3 and 6.6 of the Operating Agreement. Section 4.3 of the Operating Agreement prohibits Fume's members from "directly or indirectly, own[ing]/operat[ing] a business that is in direct competition to the Business." The "Business" is specifically defined in a recital of the Operating Agreement,[15] but simply stated, the "Business" is Fume. While Gigi and Zroya certainly own and/or operate I&K and Real Distribution, as I found above, these two companies are not "in direct competition" with Fume based on the evidence presented in connection with the PI Motion. The evidence failed to show that I&K or Real Distribution sold competing vape product, and it failed to show that they targeted the same customer base as Fume. Accordingly, Plaintiffs are unlikely to show that Gigi and Zroya violated section 4.3 of the Operating Agreement.

Likewise, Plaintiffs are unlikely to show that Gigi and Zroya violated section 6.6 of the Operating Agreement, which (absent certain inapplicable exceptions) prohibits Fume's members and managers from

> directly or indirectly, alone or as a partner, joint venturer, consultant, officer, director, employee, agent, marketing representative, distributor, independent contractor, stockholder or equity holder of any entity or business organization, directly or indirectly, engag[ing] in any business activity, and/or accept[ing] employment with any person or entity, **which is in competition with the services or products developed or being developed, planned, drafted, manufactured, marketed, distributed, sold, licensed or otherwise provided by [Fume]**.

(emphasis added). Gigi and Zroya are directly involved in Real Distribution and I&K. Thus, the issue is whether Real Distribution and/or I&K are "in competition with the services or products

---

[15] Section 5.10 of the Operating Agreement provides that "**Business**" shall have the meaning as set forth in the Recital.

developed or being developed, planned, drafted, manufactured, marketed, distributed, sold, licensed or otherwise provided by [Fume]."  ADJ failed to show that they are.  While Real Distribution and I&K sell Fume product, there is no credible evidence that they acquire such product from anyone other than Fume or that they have sold Fume product to customers or potential customers of Fume.  Rather, they apparently service smaller customers, ones that Fume does not service.  Moreover, there is no credible evidence that Real Distribution or I&K sell other vape product that competes with Fume's vape product.  Accordingly, the evidence failed to show that Defendants compete with Fume's products or services in any capacity.

For the foregoing reasons, ADJ is substantially likely to show that Zroya's purchase of the Mercedes violated the Operating Agreement, but ADJ has not demonstrated a substantial likelihood of establishing the other alleged breaches of the Operating Agreement.[16]

### 7.  Fraud in the Inducement (Count 15)

ADJ failed to establish a substantial likelihood of success on this claim.  To prevail on its claim for fraud in the inducement, ADJ will need to satisfy the following elements: "(1) a false statement of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment."  *Sena v. Pereira*, 179 So. 3d 433, 435-36 (Fla. 4th DCA 2015) (quoting *Prieto v. Smook, Inc.*, 97 So. 3d 916, 917 (Fla. 4th DCA 2012)).

---

[16] For the reasons discussed in this section, Fume is also unlikely to establish a substantial likelihood of success on Count 13 of the Complaint (Temporary and Permanent Injunction pursuant to 542.335, Florida Statutes).  Fume is unlikely to succeed on Count 13 for an additional reason as well.  That is, Count 13 addresses restrictive covenants in the Operating Agreement under a Florida statute, but section 17.13 of the Operating Agreement specifically provides for the application of South Carolina law.

The basis for ADJ's fraudulent inducement claim appears to be Gigi's and Zroya's alleged representations that they would not compete with Fume and that they would honor other promises they made in the Operating Agreement. *See* Complaint ¶¶ 204-07; PI Motion ¶¶ 161-64; [DE 107] at 73. As discussed in the Findings of Fact section above, however, there is no credible evidence that Gigi or Zroya have competed with Fume. Further, to the extent that Gigi and Zroya failed to comply with what they promised to do in the Operating Agreement, such noncompliance must be addressed through a breach of contract claim, not a fraud in the inducement claim. *See Inspirations Nevada LLC v. Med Pro Billing, Inc.*, No. 20-CV-60268, 2021 WL 2156677, at *4-7 (S.D. Fla. May 26, 2021); *Certified Collectibles Grp., LLC v. Globant, LLC*, No. 8:19-CV-1962-SDM-AEP, 2021 WL 1214963, at *4 (M.D. Fla. Mar. 31, 2021); *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So. 2d 74, 77-78 (Fla. 3d DCA 1997). Moreover, there is no credible evidence that Gigi and Zroya made any false statements of material fact. The alleged representations were not about past or existing facts. Rather, the allegations concern promises regarding future actions that Gigi and Zroya allegedly did not honor. However, ADJ failed to show that Gigi and Zroya made any such promises with no intention of honoring the promises when made. *Cf. Biscayne Inv. Grp., Ltd. v. Guarantee Mgmt. Servs., Inc.*, 903 So. 2d 251, 255 (Fla. 3d DCA 2005) ("[T]he plaintiffs made no specific allegations of misrepresentation of material facts. At most, the plaintiffs alleged a mere promise not performed, which, by itself, cannot form the predicate for actionable fraud." (citing *Alexander/Davis Props., Inc. v. Graham*, 397 So. 2d 699, 706 (Fla. 4th DCA 1981))). *See also Eagletech Commc'ns, Inc. v. Bryn Mawr Inv. Grp., Inc.*, 79 So. 3d 855, 862 (Fla. 4th DCA 2012). Accordingly, ADJ has failed to establish a substantial likelihood of success on the merits of its claim for fraud in the inducement.

### 8. Conspiracy (Counts 12 and 16)

Fume and ADJ have failed to demonstrate that they have a substantial likelihood of success on the merits of their conspiracy claims. A party bringing a civil conspiracy claim must establish the following elements for the claim to be successful: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Eagletech*, 79 So. 3d at 863. "The gist of a civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff." *Palm Beach Cnty. Health Care Dist. v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090, 1096 (Fla. 4th DCA 2009) (citation omitted).

Both conspiracy claims are predicated upon the same alleged conduct. Specifically, in Counts 12 and 16, Plaintiffs allege that:

> Defendants were members of a combination of two or more persons with the object of their combination to accomplish an unlawful goal or a lawful goal via unlawful means. In this case, they accomplished both. Here, the Defendants conspired both amongst themselves and with outside third parties, including distributors, manufacturers, sellers, and customers, to sell Fume's Products outside of Fume's distribution channels and to sell counterfeit Products, and funnel sales proceeds for Defendants' personal gain. Said Defendants had a meeting of the minds on the object or course of action. The Defendants committed unlawful, overt acts to further the object or course of action; including, various forms of fraud and breaches of fiduciary duty.

Complaint ¶¶ 191, 209. However, Plaintiffs failed to show that Gigi and Zroya agreed or conspired to undertake these alleged acts or a scheme related to such acts, and the evidence failed to show that the alleged acts were likely accomplished. In other words, the evidence did not show that Gigi and Zroya (or their companies) agreed to (or did) sell Fume product outside of Fume's distribution channels, sell counterfeit Fume product, or funnel sales proceeds for their personal gain. While Plaintiffs did establish a substantial likelihood of prevailing on their breach of fiduciary duty and

fraud by nondisclosure claims, they only did so in a limited respect – as to Gigi's and Zroya's concealment of their interest in Real Distribution.  The only other wrongdoing they established concerned Zroya's purchase of the Mercedes with Fume funds.  But the limited wrongdoing Plaintiffs demonstrated was not the gist of the alleged conspiracy, and there is no credible evidence that Gigi and Zroya agreed or conspired to do an unlawful act or to do a lawful act by unlawful means.

### B.  Irreparable Harm

Plaintiffs failed to show that they will be irreparably harmed if the Court does not issue an injunction.  "An injury is 'irreparable if it cannot be undone through monetary remedies.'"  *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020) (quoting *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010)).  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

To be sure, the allegations Plaintiffs make are quite serious.  But the evidence at this stage does not support most of Plaintiffs' allegations of wrongdoing by Gigi and Zroya.  Specifically, the evidence does not demonstrate the types of alleged wrongdoing that likely would have supported a finding of irreparable harm in this case, such as Plaintiffs' allegations regarding Defendants' competition with Fume and diversion of product from BFL, as well as the allegations concerning trademark infringement and counterfeit goods.

With respect to the limited instances of wrongdoing that the evidence likely does establish, while not insignificant, such wrongdoing will not cause irreparable harm to Plaintiffs if not enjoined.  For instance, while Gigi's and Zroya's failure to disclose their involvement in Real

Distribution may have caused past harm to Plaintiffs, it is unlikely to cause future harm as Plaintiffs are now aware of such involvement (and have chosen to no longer do business with Real Distribution as a result). The wrongdoing concerning the purchase of the Mercedes will also not bring about any irreparable harm as such wrongdoing can be remedied through an award of monetary damages equal to the purchase price of the vehicle. Moreover, Gigi and Zroya were locked out of Fume and stripped of access to Fume's bank accounts prior to the commencement of this case. Thus, even if Plaintiffs had shown that Gigi and Zroya engaged in impermissible misconduct through their withdrawal of the $6 million check, Gigi and Zroya are not in a position to repeat such wrongdoing. With respect to Real Distribution's and I&K's unpaid invoices (assuming money is owed to Fume for I&K's purchase of product), such nonpayment (if it even gives rise to a claim against Gigi or Zroya) can also be remedied by awarding money damages. *See* Real PI Order at 11, ¶ 11. Accordingly, Plaintiffs have failed to establish that they will be irreparably harmed without injunctive relief.

## **CONCLUSION**

For the foregoing reasons, I respectfully **RECOMMEND** that:

1.      the PI Motion [DE 8] be **DENIED** as to Defendants Gigi and Zroya;

2.      the Motion to Dismiss [DE 51] be **GRANTED IN PART and DENIED IN PART**;

3.      the Court find that Plaintiffs must submit their claims raised in this action against Gigi and Zroya to mediation and/or arbitration under the mediation and arbitration provision of the Operating Agreement if they wish to proceed;

4.      the Court find that it had jurisdiction to enter the TRO against Gigi and Zroya and has jurisdiction to rule on the merits of the PI Motion, as to Gigi and Zroya, consistent with the Litigation provision of the Operating Agreement; and

5.      the Court **DISMISS** this case in favor of mediation and/or arbitration.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida this 11th day of January 2022.

Jared M. Strauss
**United States Magistrate Judge**